IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWRENCE VANBUREN-MORGAN | : | |
|     Plaintiff | : | CIVIL ACTION-LAW |
| v. | : | |
| | : | |
| ALLIED SERVICES PERSONAL CARE, INC. | : | CASE NO.: 3:20-cv-00958 |
|     Defendant | : | HONORABLE ROBERT D. MARIANI |

AMENDED COMPLAINT

Plaintiff, Lawrence VanBuren-Morgan, by and through his counsel, George R. Barron, Esquire, hereby complains against Defendant, and in support thereof avers the following:

Jurisdiction and Venue

1. This action arises out of violations of the Patient Safety and Quality Improvement Act, 42 U.S.C.S. § 299b-21 *et seq., et seq.*("PSQIA"); the Older Adults Protective Services Act, 35 P.S. §§ 10225-101 *et. seq.* ("OAPSA"); Pennsylvania Whistleblower Law, 42 Pa. Stat. Ann. § 1421 *et. seq.*("Whistleblower Law"); and Pennsylvania common law.

2. The Court has jurisdiction over this action pursuant to, *inter alia*, 28 U.S.C. §§1331 and 1367.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the Defendant has a place of business in this state and in

1

this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## The Parties

4. Plaintiff Lawrence VanBuren-Morgan ("Mr. VanBuren-Morgan"), is an adult resident of Pennsylvania.

5. Defendant Allied Services Personal Care, Inc. ("Allied") is, upon information and belief, a Pennsylvania corporation headquartered at 100 Terrace Lane, Scranton, PA 18508.

6. Upon information and belief, Allied owns and operates an Assisted Living Facility under the fictitious name of "Allied Services Meade Street Residence", located at 260 S. Meade St, Wilkes-Barre, PA, 18702 (the "Meade Street facility").

## Statement of Facts

7. On or about September 16, 2019, Mr. VanBuren-Morgan entered into Allied's Certified Nurse Aide ("CNA") Training Program and began classroom training.

8. Beginning on or about November 25, 2019, Mr. VanBuren-Morgan was assigned to complete the clinical portion of his training as a Student Aide at Allied's Meade Street facility.

9. As a Student Aide, Mr. VanBuren-Morgan worked under the supervision of Allied staff, providing basic nursing services to the residents of the Meade Street facility.

10. As a Student Aide, Mr. VanBuren-Morgan was expected to take direction and supervision from other Allied staff including CNAs, Licensed Practical Nurses ("LPNs"), Registered Nurses ("RNs") and RN Supervisors.

11. Following completion of the clinical portion of his training, Mr. VanBuren-Morgan would have been scheduled to take the test to become a CNA.

12. Allied did not provide Mr. VanBuren-Morgan with adequate training or instruction regarding the reporting of resident abuse before assigning him to work at the Meade Street facility.

13. Upon information and belief, Allied did not provide any of their Meade Street facility staff with adequate training or instruction regarding the reporting of resident abuse.

14. Allied assigned Mr. VanBuren-Morgan to work a double shift (two eight (8) hour shifts) on December 14, 2019 as a Student Aide at the Meade Street facility.

15. Near the end of his first eight (8) hour shift, at approximately 2:15 p.m., Mr. VanBuren-Morgan heard a resident yelling "get your hands off me", and "stop touching me" from behind the closed door of a bathroom.

16. Other Allied staff who were within earshot of the yelling, and closer to the bathroom than Mr. VanBuren-Morgan, ignored the yelling and did not respond.

17. Because no one else responded, Mr. VanBuren-Morgan entered the bathroom.

18. Inside the bathroom, Mr. VanBuren-Morgan found an Allied CNA named Berianne Smith ("CNA Smith") with a resident ("Ms. Doe") of the facility.[1]

19. Upon information and belief, CNA Smith was there to help Ms. Doe use the bathroom.

20. Ms. Doe was confined to a wheelchair and required assistance to use the bathroom.

21. CNA Smith was alone with Ms. Doe, despite the fact that union information and belief, regulations required two staff to assist residents in situations like this.

22. When he entered the bathroom, Mr. VanBuren-Morgan saw that CNA Smith was pinching Ms. Doe's nipples, and that Ms. Doe appeared to be in pain.

---

[1] To protect the privacy of the abused resident, Plaintiff will refer to her as "Ms. Doe" throughout.

23. CNA Smith stopped what she was doing immediately when Mr. VanBuren-Morgan entered the room.

24. Mr. VanBuren-Morgan was shocked and confused by what he witnessed.

25. In order to get Ms. Doe away from CNA Smith, Mr. VanBuren-Morgan told CNA Smith that he would take Ms. Doe back to her room, and CNA Smith left the bathroom.

26. Ms. Doe was a care-dependent resident/patient of the Meade Street facility and was, upon information and belief, an individual over the age of sixty (60) years.

27. Mr. VanBuren-Morgan took Ms. Doe out of the bathroom, and another Allied CNA, Tina May (CNA May) helped Mr. VanBuren-Morgan return Ms. Doe to her room.

28. Mr. VanBuren-Morgan told CNA May that he had seen CNA Smith pinching Ms. Doe's nipples.

29. CNA May said "that's messed up" but did not provide any further direction to Mr. VanBuren-Morgan.

30. As a Student Aide, Mr. VanBuren-Morgan thought that CNA May would either report the incident to the appropriate staff member, or give him guidance as to what he should do next.

31. Mr. VanBuren-Morgan reported the abuse to CNA May in good faith so that it would be investigated and addressed through proper channels.

32. Mr. VanBuren-Morgan believed that by intervening to stop the abuse, removing Ms. Doe from the abuser, and reporting the incident to CNA May, he had fulfilled his duty.

33. Upon information and belief, CNA May did not further report, investigate, or otherwise act upon what Mr. VanBuren-Morgan told her.

34. Upon information and belief, CNA May was not disciplined by Allied.

35. Upon information and belief, CNA May finished her shift at 3 p.m. and went home.

36. Upon information and belief, Ms. Doe had complained about, and shown aggression toward, CNA Smith in the past, but no one at Allied addressed her complaints or concerns.

37. Because Mr. VanBuren-Morgan's first shift was about to end, he began performing charting that was required to be performed before the end of each shift.

38. At approximately 2:23 p.m. (approximately eight (8) minutes after the first incident) Mr. VanBuren-Morgan heard Ms. Doe yelling from behind the closed door to her room, "help, get her out of here."

39. Other Allied staff who were within earshot of the yelling and closer to Ms. Doe's room than Mr. VanBuren-Morgan ignored the yelling and did not respond.

40. Mr. VanBuren-Morgan entered Ms. Doe's room to check on Ms. Doe, discovered that CNA Smith was in Ms. Doe's room and observed that Ms. Doe had a bloody nose.

41. Ms. Doe told Mr. VanBuren-Morgan that CNA Smith had struck her nose.

42. CNA Smith said that Ms. Doe's nose just started bleeding.

43. CNA Smith walked out of Ms. Doe's room.

44. Mr. VanBuren-Morgan was aware that CNA Smith would be leaving the facility at the end of her shift at 3 p.m.

45. Mr. VanBuren-Morgan treated Ms. Doe's bleeding nose and tried to help Ms. Doe calm down.

46. Mr. VanBuren-Morgan did not witness CNA Smith striking Ms. Doe.

47. After assuring that Ms. Doe was safe, and after CNA Smith had left the building, Mr. VanBuren-Morgan reported the abuse to a CNA named Janna Burrowes ("CNA Burrowes").

48. Mr. VanBuren-Morgan reported the abuse to CNA Burrowes in good faith so that it would be investigated and addressed through proper channels.

49. CNA Burrowes told Mr. VanBuren-Morgan to report the incident to LPN Jennifer LNU.[2]

50. Mr. VanBuren-Morgan reported both incidents (the bathroom incident and the bloody nose incident) to LPN Jennifer LNU.

51. Mr. VanBuren-Morgan reported the abuse to LPN Jenifer LNU in good faith so that it would be investigated and addressed through proper channels.

52. Mr. VanBuren-Morgan and LPN Jennifer LNU interviewed and examined Ms. Doe, confirming her account and injuries.

53. After confirming Ms. Doe's account and injuries, LPN Jennifer LNU continued to discuss the situation with Mr. VanBuren-Morgan, making statements that suggested she was reluctant to report the abuse further including "Do you know what you are doing? You are reporting abuse."; "Do you know what's going to happen?" and "Everybody is going to get in trouble."

---

[2] As used herein, LNU indicates "last name unknown".

54. Upon information and belief, LPN Jennifer LNU made these statements because she knew that the reporting of abuse was discouraged by Allied.

55. When Mr. VanBuren-Morgan did not relent, LPN Jennifer LNU said "I have to think about it" and "are you sure this is what you want to do?" and left Mr. VanBuren-Morgan.

56. Approximately one (1) hour later, LPN Jennifer LNU came back to Mr. VanBuren-Morgan with RN Supervisor Lori LNU and they discussed for approximately thirty (30) minutes what should be done regarding the abuse.

57. RN Jennifer LNU and RN Supervisor Lori LNU then reported the abuse to RN Supervisor Marie LNU.

58. Approximately twenty (20) minutes later, RN Supervisor Marie LNU interviewed Mr. VanBuren-Morgan, examined and interviewed Ms. Doe, and confirmed that she had been abused by CNA Smith.

59. RN Supervisor Marie LNU told Mr. VanBuren-Morgan to write a statement for Allied regarding what had happened.

60. RN Supervisor Marie LNU also called the police.

61. When the police arrived, they also asked Mr. VanBuren-Morgan to write a statement.

62. Upon information and belief, the police officers told Allied that they would come back to the facility to obtain Mr. VanBuren-Morgan's statement the next morning.

63. The statements written by Mr. VanBuren-Morgan for Allied and the police were identical.

64. All Allied staff involved appeared unfamiliar with the proper avenues for reporting abuse at the Meade Street facility, and several hours elapsed between the time that Mr. VanBuren-Morgan reported the abuse to CNA Burrowes and the time that RN Supervisor Marie LNU called the police.

65. Mr. VanBuren-Morgan cooperated fully in the resulting investigation.

66. Mr. VanBuren-Morgan wrote statements for Allied and for the police, then continued his shift as a Student Aide providing care to Meade Street facility residents.

67. No one suggested that Mr. VanBuren-Morgan should not be permitted to continue working as a Student Aide providing care to Meade Street facility residents.

68. On the following day, Mr. VanBuren-Morgan reported for work, and worked approximately four (4) hours of his scheduled eight (8) hour shift.

69. Approximately four (4) hours into Mr. VanBuren-Morgan's shift, an Allied Nursing Supervisor (name unknown) told him that he had to go home because of the abuse investigation and "Allied policy."

70. Mr. VanBuren-Morgan questioned the Nursing Supervisor as to whether he was being punished for reporting the abuse of Ms. Doe.

71. Soon thereafter, Allied called Mr. VanBuren-Morgan at home and asked him to come back to the facility to speak to Allied's Vice President, James Cooney.

72. At the facility, Mr. Cooney introduced himself to Mr. VanBuren-Morgan as Vice President of Allied.

73. During the meeting with Mr. VanBuren-Morgan, Mr. Cooney and his assistant (name unknown) reviewed Mr. VanBuren-Morgan's personnel file and criminal background check.

74. Mr. Cooney and his assistant also reviewed the statement that Mr. VanBuren-Morgan had written.

75. Mr. Cooney and his assistant instructed Mr. VanBuren-Morgan to rewrite the statement he had given, adding some information such as details and times, and removing other information.

76. Upon information and belief, Mr. Cooney had Mr. VanBuren-Morgan rewrite the statement because he knew that the Pennsylvania

Department of Health ("DOH") would investigate the abuse, and he did not want DOH to read Mr. VanBuren-Morgan's first statement.

77. While he was with Mr. Cooney and his assistant, Mr. VanBuren-Morgan overheard someone ask to speak to him by name.

78. Upon information and belief, the person who asked to speak to Mr. VanBuren-Morgan was a representative of DOH and was investigating the abuse incident.

79. Mr. VanBuren Morgan then overheard Mr. Cooney and his assistant tell the DOH representative that Mr. VanBuren-Morgan was not yet at the facility.

80. Only after Mr. VanBuren-Morgan finished rewriting his statement did Allied permit him to speak to the DOH representative.

81. After Mr. VanBuren-Morgan spoke to the DOH representative, Allied placed Mr. VanBuren-Morgan back on suspension.

82. Upon information and belief, Allied was cited by DOH for the abuse committed by CNA Smith.

83. CNA Smith was criminally charged for her abuse of Ms. Doe.

84. CNA Smith's abuse came to light only because of Mr. VanBuren-Morgan's report.

85. Had Mr. VanBuren-Morgan ignored Ms. Doe's cries for help, as other Allied staff did, Mr. VanBuren-Morgan would still be employed by Allied.

86. Upon information and belief, had Mr. VanBuren-Morgan ignored Ms. Doe's cries for help, as other Allied staff did, CNA Smith would still be employed by Allied, and would still be abusing Ms. Doe and potentially other residents of the Meade Street facility.

87. Ms. Smith's abuse of Ms. Doe at the Meade Street facility was widely reported in local media and caused Allied considerable embarrassment.

88. Upon information and belief, Allied terminated CNA Smith's employment on or about December 19, 2019, approximately five (5) days after she abused Ms. Doe.

89. Allied also terminated Mr. VanBuren-Morgan's employment on or about December 19, 2019, approximately five (5) days after he reported CNA Smith's abuse of Ms. Doe.

90. Allied terminated Mr. VanBuren-Morgan's employment because he reported CNA Smith's abuse of Ms. Doe, to punish Mr. VanBuren-Morgan for doing so, and to discourage other Allied staff from reporting abuse.

91. Upon information and belief, none of the Allied staff members who failed to intervene in response to Ms. Doe's cries of distress, or who delayed the investigation into Ms. Doe's abuse because of their own confusion and/or reluctance, were disciplined or terminated by Allied.

92. As a result of Allied's actions Mr. VanBuren-Morgan has suffered emotional harm, embarrassment, humiliation, mental anguish and loss of self-esteem, as well as economic loss and damage to his reputation.

93. Mr. VanBuren-Morgan also seeks punitive damages to protect himself and others from termination for exercising their rights, and doing their civic and professional duty in reporting elder abuse, and to prevent further violations of the law by Allied and other employers.

## COUNT ONE
Unlawful Retaliation in Violation of the
Patient Safety Quality Improvement Act of 2005,
42 U.S.C.S. § 299b-21 *et seq.*

94. All previous paragraphs are incorporated as if set forth herein.

95. At all times relevant hereto Allied was a "provider" as defined by Patient Safety and Quality Improvement Act ("PSQIA").

96. The PSQIA was intended to foster voluntary reporting by health care providers and to maintain a nonpunitive environment for those reporting abuse in good faith.

97. Mr. VanBuren-Morgan reported the abuse of Ms. Doe to Allied in good faith.

98. Mr. VanBuren-Morgan reported the abuse of Ms. Doe to Allied with the intention of having the abuse reported to the appropriate state and federal authorities including any applicable "patient safety organization" as that term is defined by the PSQIA.

99. Allied retaliated against Mr. VanBuren-Morgan because he reported the abuse of Ms. Doe by, *inter alia*, suspending him and terminating his employment.

100, In retaliating against Mr. VanBuren-Morgan, Allied violated the PSQIA.

COUNT TWO
VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW
43 Pa. Stat. Ann. § 1421 *et seq.*
Retaliation and Wrongful Termination

101. All previous paragraphs are incorporated as if set forth herein.

102. Upon information and belief, Allied is a recipient of public funding including Medicare and/or Medicaid.

103. Upon information and belief, Allied is a "public body" as that term is defined in the Pennsylvania Whistleblower Law, in that Allied is funded in some amount by or through the Commonwealth or political subdivision authority.

104.  Under the Pennsylvania Whistleblower Law, no employer may "discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally, or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." 43 Pa. Stat. Ann.§ 1423.

105.  Additionally, Pennsylvania's Medical Care Availability and Reduction of Error ("MCARE") Act, 40 P.S. Insurance § 1303.101, *et seq.* specifically protects health care professionals from retaliatory action under the Pennsylvania Whistleblower Law for reporting "incidents" or "serious events", and authorizes the protections remedies set forth in the Pennsylvania Whistleblower Law under 40 P.S. § 1303.308.

106.  Mr. VanBuren-Morgan made a good faith report to Allied, to whom it was appropriate and reasonable to make such report, of an incident of wrongdoing or waste, specifically, the abuse of Ms. Doe.

107.  The report made by Mr. VanBuren-Morgan was made in good faith and without malice or personal benefit.

108.  Allied retaliated against Mr. VanBuren-Morgan because he reported the abuse of Ms. Doe by, *inter alia*, suspending him and terminating his employment.

# COUNT THREE
## UNLAWFUL RETALIATION AND INTIMIDATION IN VIOLATION OF THE OLDER ADULTS PROTECTIVE SERVICES ACT
### 35 P.S. § 10225.101 *et seq.*

109. All previous paragraphs are incorporated as if set forth herein.

110. The Older Adults Protective Services Act ("OAPSA") mandates reporting of elder abuse.

111. OAPA prohibits retaliation against employees for reporting abuse under the act, stating that "[a]ny person making a report or cooperating with the agency, including providing testimony in any administrative or judicial proceeding, and the victim shall be free from any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity." 35 P.S. § 10225.101 *et seq.*

112. Mr. VanBuren-Morgan's termination was in retaliation for the exercise of his legal right and duty to address and report elder abuse.

113. As a Student Aide, Mr. VanBuren-Morgan was a mandated reporter, and had a legal obligation to address and report the abuse of Ms. Doe.

114. Mr. VanBuren-Morgan satisfied that legal obligation by intervening to assist Ms. Doe, by reporting the abuse, and by cooperating in the ensuing investigations.

115. Allied's conduct in terminating Mr. VanBuren-Morgan's employment in retaliation for reporting elder abuse, was purposeful, willful, self-interested, wanton, outrageous, and illegal pursuant to OAPSA.

116. Allied retaliated against Mr. VanBuren-Morgan for making the report by, *inter alia*, suspending him and terminating his employment.

## COUNT FOUR
## WRONGFUL DISCHARGE

117. All previous paragraphs are incorporated as if set forth herein.

118. Mr. VanBuren-Morgan was legally obligated to address and report the abuse of Ms. Doe.

119. Defendant terminated Mr. VanBuren-Morgan's employment in retaliation for his exercise of his legal right and duty to address and report the abuse of Ms. Doe.

120. As an employee of an assisted living facility Mr. VanBuren-Morgan had a legal obligation to address and report resident abuse.

121. The legal requirement that Student Aides like Mr. VanBuren-Morgan address and report resident abuse constitutes a clear mandate of the public policy of the Commonwealth of Pennsylvania as set forth in, *inter alia,* OAPSA and Medical Care Availability and Reduction of Error (MCARE) Act, 40 Pa. Stat. § 1303.101 *et seq.*

122. Allied's conduct in terminating Mr. VanBuren-Morgan's employment in retaliation for addressing and reporting resident abuse was unlawful, purposeful, willful, self-interested, wanton and outrageous.

WHEREFORE, Mr. VanBuren-Morgan respectfully requests that this Honorable Court:

(a) Enter a declaratory judgment that Allied's actions complained of herein have violated and continue to violate the rights of Mr. VanBuren-Morgan as secured by the statutes of the United States and the statutes and common law of the Commonwealth of Pennsylvania; and

(b) Award to Mr. VanBuren-Morgan:

1. damages for loss of wages and benefits;

2. the value of future lost wages and benefits;

3. compensation for damage to Mr. VanBuren-Morgan's reputation;

4. other actual damages sustained by Mr. VanBuren-Morgan as a result of the wrongful conduct of Allied;

5. compensatory damages;

6. damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, emotional distress, anguish and humiliation, loss of self-esteem and loss of Mr. VanBuren-Morgan's ability to provide himself with the rewards of his chosen career

7. equitable relief (including, but not limited to, reinstatement, back pay, and restoration of benefits);

8.  punitive or exemplary damages in a monetary award in order to discourage future unlawful behavior on the part of Allied and its agents;

9.  interest on all of the above;

10. attorney fees, costs, disbursements and expenses; and

11. such further and additional relief as this Honorable Court deems just and proper.

## DEMAND FOR JURY

Mr. VanBuren-Morgan demands a jury trial for all claims triable by a jury.

/s/ George R. Barron
George R. Barron, Esq.
Attorney for Plaintiff
PA Attorney ID# 88747
88 N. Franklin St.
Wilkes-Barre, PA 18701
(570) 824-3088